**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| THERESA JACOBS, on behalf of herself and all others similarly situated, | Civil Action No. _____ |
| Plaintiff, v. | CLASS ACTION COMPLAINT |
| MONAHAN PRODUCTS, LLC, d/b/a UPPABABY, a Massachusetts Limited Liability Company, | JURY DEMANDED |
| Defendant. | |

Plaintiff, Theresa Jacobs ("Plaintiff"), through her undersigned counsel, hereby submits this class action complaint against Defendant MONAHAN PRODUCTS, LLC, d/b/a UPPABABY (hereinafter referred to as "UPPAbaby" or "Defendant") and alleges the following upon personal knowledge as to the allegations pertaining to herself, and upon information and belief, based upon the investigation of counsel, as to all other allegations, as follows:

## INTRODUCTION

1.     This is a class action brought on behalf of all persons who reside in the United States and purchased the Aria, Mesa V2 or Mesa Max infant car seats (the "Car Seats"), designed, manufactured, advertised and sold by Defendant during the class period defined below ("Class Period", "Class").

2.     Unbeknownst to purchasers, including Plaintiff and members of the Class ("Class Members"), each of the Car Seats in issue were designed, manufactured, and sold with a dangerous and uniform design defect in violation of state and federal law for defective materials,

1

workmanship, manufacturing and marketing. This design flaw caused many infants using the Car Seats to sit in a curved or C shaped position, forcing them to have to sit with their chins close to their chests.  This position results in visible signs of distress, including drooling, choking, crying, excessive sweating and, in some cases, life threating conditions such as airway constriction.

3.      Pediatric medical guidance, including publications by the American Academy of Pediatrics (AAP), has long recognized that placing infants in a "C-shaped" position, where the chin slouches toward the chest, can partially or fully obstruct the airway. This posture impairs oxygen intake and increases the risk of suffocation or positional asphyxia. The risk is especially heightened in newborns and preterm infants, whose underdeveloped neck muscles limit their ability to reposition themselves or maintain an open airway. A car seat that consistently forces infants into this posture, even when properly used, is inherently unsafe for its intended purpose and creates foreseeable safety risks to the end user.[1]

4.      The defective design exposes infants, particularly newborns, to the risk  of asphyxiation and other serious harm especially for younger infants who have less developed and weak neck muscles. The defect is inherent in each Car Seat model and was present at the time of sale.

5.      During the Class Period, Defendant expressly warranted and promised through packaging, marketing materials, its website, its written warranty and product manuals and other forms of advertising that the Car Seats were free from defects and suitable for their intended use.

---

[1] *See* American Academy of Pediatrics, *Policy Statement: Safe Sleep and Skin-to-Skin Care*, Pediatrics, Vol. 138, No. 3 (Sept. 2016), https://doi.org/10.1542/peds.2016-1889 (recognizing risk of airway obstruction in improperly positioned infants); see also American Academy of Pediatrics, *Technical Report: SIDS and Other Sleep-Related Infant Deaths*, Pediatrics, Vol. 138, No. 5 (Nov. 2016), https://doi.org/10.1542/peds.2016-2938 (noting "flexion of the head can lead to airway obstruction").

Further, Defendant warranted that the Car Seats were merchantable and fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a non-defective condition for use by the purchasers for the ordinary purpose for which they were intended and not otherwise injurious.

6.      The Car Seats came with a "Product Lifetime Warranty" for the life of the product lasting for the presumed seven-year life of the Car Seats from the date of manufacture. Defendant warranted that the Car Seats were "free from manufacturing defects" under normal use and in compliance with the operating instructions.[2]

7.      Defendant had a duty to design, engineer, manufacture, inspect and test the Car Seats to ensure they were safe and suitable for ordinary use, particularly the safe positioning of infants during transport.

8.      UPPAbaby knew and had exclusive knowledge that the Car Seats were defective and were designed with a dangerous flaw that could lead to serious discomfort by the infants using them, including limiting or preventing them from properly breathing and thereby posing an unreasonable safety hazard, but actively concealed that material fact.

9.      Prior to Plaintiff's purchase of the Aria car seat, Defendant had received, and had access to, numerous consumer complaints concerning the Car Seats' inability to support proper infant positioning. These complaints consistently described breathing difficulties and postural problems where the infants were caused to sit in a C position. Defendant further received numerous requests for replacement seats.

---

[2] UPPAbaby, *Warranty*, UPPAbaby, https://uppababy.com/warranty/ (last visited Aug. 8, 2025)

10.     Despite having received numerous complaints concerning this design flaw and the discomfort or worse that certain infants experienced when using the Car Seats, and knowing that such a flaw could cause infants using the Car Seats significant distress or worse, Defendant continued to manufacture, advertise and sell the Car Seats with the defect, while actively and intentionally concealing from Class Members that the Car Seats were manufactured with this design defect.

11.     Defendant continued to actively conceal this design flaw even after it removed one of the Car Seats, the Mesa Max, from the market, while concealing and intentionally misleading Plaintiff and others about the true reasons for removing that Car Seat from the market and telling them only that it was to make room for new models.

12.     Defendant made these misrepresentations and/or engaged in the knowing concealment of the truth with the intention that they be relied upon by Plaintiff and Class members.

13.     Plaintiff and Class Members reasonably relied on Defendant's advertising, warranties and representations when deciding to purchase, and to pay a premium price for, the Car Seats.  They reasonably believed and expected that the Car Seats were free of defects and fit for their intended use.  Defendant, nonetheless, has refused to refund Class Members for their purchases.

14.     Plaintiff brings this action to recover for Defendant's unlawful conduct in knowingly misrepresenting the condition and quality of the Car Seats, by intentionally and fraudulently concealing the true nature and state of its Car Seats, and by failing to honor its warranty obligations.

4

15.     Plaintiff and Class Members have sustained ascertainable money and property damage that is measurable and quantifiable, and were caused to suffer financial loss, inconvenience, and frustration as a result of Defendant's fraudulent and unconscionable course of fraudulent conduct.

16.     Plaintiff and Class Members are entitled to damages, including but not limited to treble damages, attorney's fees and costs.

## PARTIES

17.     Plaintiff, Theresa Jacobs, is a resident of Marlton, New Jersey, and purchased an UPPAbaby Aria car seat in or about December 2024, through Amazon.

18.     Defendant Monahan Products, LLC d/b/a UPPAbaby, is a Massachusetts limited liability company with its principal place of business in Massachusetts.  It is wholly owned by 72 Blazer Holdings, LLC, a Delaware limited liability company with its principal place of business in Massachusetts.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action under 28 U.S.C. §1332(d). The aggregated claims of the individual Class Members exceed the sum of $5,000,000, exclusive of interest and costs. This is a class action in which the proposed Class contains  more than 100 members, and at least one member of the Class is a citizen of a state different from Defendant.

20.     This Court has personal jurisdiction over Defendant because Monahan Products LLC is registered to do business in the State of New Jersey and is legally authorized to do so. Moreover, Defendant conducts substantial business in  New Jersey.  Defendant advertises and sells its baby gear products, including the Car Seats at issue, to consumers within this state, both directly and through distributors.

21.     Venue is proper in this district under 28 U.S.C.§1391(b) because a substantial portion of the events or omissions giving rise to the claims herein occurred in this District, and because Defendant transacts business here.

## BACKGROUND

### UPPAbaby

22.     UPPAbaby is considered one of the most popular affordable luxury baby gear companies in recent years.  Its current line of products includes car seats, including the Car Seats at issue here, strollers, rumble seats, highchairs, playards/changing stations, bouncers, and accessories, such as snack trays, rain shields, infant snug seats, and bassinets and stands.

23.     Its car seats are part of its travel system suite of products, in which certain of its car seats can be paired or attached to its strollers so that the combination can be used as a "portable travel system for wherever the road takes" an infant, allowing the infant to "go from drive to stroll without skipping a beat".[3]  This travel suite of products also includes accessories such as cup holders, and an organizing pouch that attach to the stroller.

24.     An integral part of this "travel system" are certain of the Car Seats at issue here, including the Aria and Mesa V2 seats, which pair with the UPPAbaby Vista V3 stroller.

25.     UPPAbaby distributes its products online, through its own website, and through other online retailers, such as Amazon, Target and Babylist, and at baby and other brick and mortar stores.  UPPAbaby also maintains a limited number of "Hub" stores, where parents can go to try out UPPAbaby products and receive advice.

---

[3] UPPAbaby, *Vista V3 Travel Systems*, UPPAbaby,
https://uppababy.com/bundles/vista-v3-travel-systems/ (last visited Aug. 8, 2025).

26.     UPPAbaby was on notice that a design defect in one of its products, resulting in consistent consumer complaints and child injuries, could necessitate  an expensive and time-consuming product recall. Defendant had already been subject to such recalls in the past.

27.     For instance, in 2015, UPPAbaby voluntarily recalled its 2015 Cruz and 2015 Vista strollers, as well as its 2015 rumble seat, after receiving reports that these products posed a choking hazard for some children.[4]

28.     That recall affected approximately 71,000 units in the United States, and an additional 8,000 units in Canada.  *Id*.

29.     In September 2021, UPPAbaby recalled its All-Terrain Ridge Jogging Stroller, due to the risk that the strollers' rear disc brakes had openings that could cause amputation or laceration if a non-occupant child's fingertip got caught while the stroller was in use.[5]

30.     That recall involved approximately 14,400 units.

31.     Similarly, on or about June 30, 2021, UPPAbaby recalled and offered to replace 86,000 adapters used with its RumbleSeat attachment (a seat which attaches to a stroller for a second child), after it received at least 135 reports of children being injured after riding in these rumble seats which detached from the strollers.[6]

---

[4] U.S. Consumer Product Safety Commission (CPSC), *UPPAbaby Recalls Strollers and RumbleSeats Due to Choking Hazard*, CPSC (July 23, 2015), https://www.cpsc.gov/Recalls/2015/UPPAbaby-Recalls-Strollers-and-RumbleSeats (last visited Aug. 8, 2025).

[5] U.S. Consumer Product Safety Commission (CPSC), *UPPAbaby Recalls RIDGE Jogging Strollers Due to Fingertip Amputation Hazard; One Injury to Child Reported* (Sept. 1, 2022), https://www.cpsc.gov/Recalls/2022/UPPAbaby-Recalls-RIDGE-Jogging-Strollers-Due-to-Fingertip-Amputation-Hazard-One-Injury-to-Child-Reported (last visited Aug. 8, 2025). cpsc.gov+15cpsc.gov+15growingyourbaby.com+15.

[6] U.S. Consumer Product Safety Commission (CPSC), *UPPAbaby Recalls Adapters Included with RumbleSeats Due to Child Fall Hazard* (June 30, 2021), https://www.cpsc.gov/Recalls/2021/UPPAbaby-Recalls-Adapters-Included-with-RumbleSeats-Due-to-Child-Fall-Hazard (last visited Aug. 8, 2025).

32.    Consequently, UPPAbaby recalled the adapters due to the child fall hazards for adapters that were sold from the period September 2014 to July 2019.

33.    Despite having full knowledge of these prior recalls and receiving consistent and credible reports that the Car Seats in issue here suffered from a dangerous design defect, Defendant chose not to issue a recall or withdraw the products.  Instead, it intentionally concealed the defect in an effort to avoid reputational and financial costs associated with another product recall.

34.    These prior recalls demonstrate that UPPAbaby was familiar with both the risks associated with defective design and the legal and public safety obligations that arise when child safety is compromised and underscores the willfulness of its concealment.

### UPPAbaby's Advertising Emphasizes Safety and Design of its Products, Concealing Design Defects

35.    UPPAbaby's advertising is specifically designed to reassure parents of infants that their products, particularly their Car Seats, are safe, free from defects and designed for the purposes for which they were intended.

36.    For example, UPPAbaby advertised the Mesa Max as "[b]ringing the next generation in safety, innovation, and enhanced comfort", "with thoughtful details and robust features for the ultimate car seat solution."  It was further described as giving "parents reassurance every ride."[7]

37.    The description, along with a You Tube video by UPPAbaby, presumably demonstrates how to fit an infant into the Mesa Max car seat.  In a misleading effort to conceal the design flaw, the video shows the dummy baby with its head in the proper upright position, rather

_____

[7] UPPAbaby, *Mesa Max Infant Car Seat (North America)* [YouTube playlist], YouTube, https://www.youtube.com/playlist?list=PLQgx-eLSC68wK_b3m4SA3Z1Qc_zonjy-Q (last visited Aug. 8, 2025).

than the slouched, and not with its chin to chest position that many real infants reportedly experience when using the seat.[8] Significantly the comments below the You Tube video, repeatedly complained that regardless of the size of the baby, the baby is forced to "slouch" in the seat—the dangerous C position, causing parents anxiety. *Id*.

38.    Another You Tube video for the Mesa Max by UPPAbaby specifically noted that the seat could keep infants "safe and sound", again failing and/or concealing the design flaw and showing an infant in the correct position.[9]

39.    The description of the Mesa Max, which was formerly on the UPPAbaby website, emphasized the Mesa Max's "standout feature"—the load leg—but concealed or failed to disclose that infants could not be properly positioned in the seat.  Instead, the discussion of the Mesa Max states that with the "load leg" "this car seat safety innovation" was "creating buzz in the parenting community" and claimed it would "elevate protection for your most cherished passenger on the road."[10]

40.    The description further stated, that the "Load Leg on the Mesa Max is just the start of its impressive list of included safety features", and further assured customers that the seat was "bringing the next generation in safety, innovation, and enhanced comfort . . . designed to give

---

[8]UPPAbaby, *Mesa Max Infant Car Seat (North America)* https://www.youtube.com/playlist?list=PLQgx-eLSC68wK_b3m4SA3Z1Qc_zonjy-Q (last visited Aug. 8, 2025).
[9] UPPAbaby *Mesa Max Infant Car Seat – Fitting Your Child,* YouTube (last visited Aug. 11, 2025), https://www.youtube.com/watch?v=leGtE1-fTZg.
[10]UPPAbaby, *UPPAbaby Mesa Max: Elevating Safety with Included Load Leg*, UPPAbaby (Dec. 1, 2023), https://uppababy.com/bumps-babies-blogs/uppababy-mesa-max-elevating-safety-with-included-load-leg/ (last visited Aug. 8, 2025).

[parents] reassurance in every ride."[11]  Notably, nowhere did the advertising reveal the designed

flaw in the Car Seat.

41.    The Mesa Max has since been taken off the market  without Defendant disclosing

its flawed design.  Prior to withdrawing the Mesa Max, Defendant advertised the Mesa Max with

statements such as the following: "As parent and caregivers, we intimately understand the complex

emotions associated with ensuring the safety of your little ones. This understanding drives our

commitment to transcend the ordinary, ensuring that every journey with your child is as secure and

comforting as a loving embrace . . . . That's precisely the sentiment behind our UPPAbaby Mesa

Max and it's standout feature:  the load leg . . . . Car seat safety shouldn't be scary.[12]

42.    UPPAbaby's promotional materials for the Aria and Mesa V2 car seats similarly

failed to disclose their shared design defects and the associated safety risks for infants.

43.    With regard to the Mesa V2, UPPAbaby stated that "[t]he removable infant insert

is designed to provide better fit and body positioning for babies approximately 4-11 lbs.", and that

a foam insert that UPPAbaby then offered instead of disclosing the design flaw inherent in the Car

Seat, "is designed to optimize fit and body positioning for your child"—implicitly admitting that

the Mesa V2 was not properly designed for optimal fit.[13]

---

[11]UPPAbaby, *UPPAbaby Mesa Max: Elevating Safety with Included Load Leg* (published
approximately 1.7 years ago), UPPAbaby (blog),
https://uppababy.com/bumps-babies-blogs/uppababy-mesa-max-elevating-safety-with-included-
load-leg/ (last visited Aug. 8, 2025).
[12]UPPAbaby, *UPPAbaby Mesa Max: Elevating Safety with Included Load Leg* (Dec. 1, 2023),
UPPAbaby (blog),
https://uppababy.com/bumps-babies-blogs/uppababy-mesa-max-elevating-safety-with-included-
load-leg/ (last visited Aug. 8, 2025).
[13]UPPAbaby, *Mesa V2 Infant Car Seat* (product page), UPPAbaby,
https://uppababy.com/car-seats/infant/mesa-v2/ (last visited Aug. 8, 2025).

44.     The UPPAbaby website further touted that "[t]he adjustable headrest is reinforced with EPP foam to help absorb energy while the integrated design of our Side Impact Protection keeps baby's head protected during a collision." *Id.*

45.     In adversiting the Aria, UPPAbaby similarly declared that it "was designed to define new standards of safety and convenience in the realm of easy-to-carry baby gear', and that "[i]ts strong yet light build with SmartSecure technology, Anti-Bound+Panel, and extra-large canopy provides a safe and comfortable ride for baby."[14]

46.     Defendant also represented that the Aria provided an "Optimized Fit Suitable for Preemies", and that the "[t]wo-piece robust infant insert ensures proper body positioning for infants weighing as little as 4lbs." *Id.*

47.     These representations were clearly intended to give concerned parents the impression that their infants would be properly and safely positioned, protected in the event of a crash, and that the Car Seats were manufactured without defects and conformed to their warranties.

48.     At no point did UPPAbaby disclose that the Car Seats could force infants into a chin-to-chest position associated with compromised breathing and potential asphyxiation, conditions that render the products not only defective but inherently unsafe.

49.     Through these advertising statements, omissions, and visual misrepresentations, UPPAbaby actively concealed a dangerous design defect from the public.

**Defendant Knew or Should Have Known about the Defect from the Complaints
that it Received and that Were Posted on Public Forums**

---

[14]UPPAbaby, *Aria – Jake* (infant car seat product page), UPPAbaby, https://uppababy.com/car-seats/infant/aria/jake/ (last visited Aug. 8, 2025).

50.    Commencing in about 2023, numerous reports emerged describing concerns with infant chin to chest positioning and breathing issues linked to the design of the Car Seats. These reports put Defendant on notice of the design defect.

51.    Concerned parents shared personal accounts of their infant's discomfort while using the Car Seats and advised other parents against purchasing one of the Car Seats.

52.    These complaints described infants appearing visibly uncomfortable, crying persistently, or experiencing difficulty breathing when placed in the Car Seats. Many parents concluded that the Car Seats posed a "suffocation risk."

53.    For example, on Amazon, one parent reviewing the Mesa V2, wrote that her baby appeared "slouched" in the car seat and "really sunken". Another parent reported that her baby sweated profusely and seemed "scrunched". Others complained that their infants looked like they were sitting in a "weird" position. Still another posted that her "baby's head and neck were in an awkward position" and that "the pediatrician recommended that we use a different car seat."[15]

54.    Another parent related that her infant cried so intensely upon being placed in the Mesa Max that her face turned purple or red.[16]

55.    One parent recounted a far more serious incident, stating:

My baby actually asphyxiated at 5 weeks old. We put him in his Mesa Max and he stopped breathing within 60 seconds. Full blown CPR and spent 4 days in the

---

[15]Amazon.com, *Customer Reviews for UPPAbaby Mesa V2 Infant Car Seat/Easy Installation/Innovative SmartSecure Technology/Base + Robust Infant Insert Included/Direct Stroller Attachment/Jake (Charcoal)*, https://www.amazon.com/product-reviews/B0B94TJ36K/ref=cm_cr_getr_d_paging_btm_prev_1?ie=UTF8&reviewerType=all_reviews&pageNumber=1 (last visited Aug. 11, 2025).

[16]Google.com, Search results for "UPPAbaby Mesa Max car seat reviews," https://www.google.com/search?q=uppababy+mesa+max+car+seat+reviews (last visited Aug. 11, 2025).

hospital. I'm absolutely beside myself to learn the manufacturer was aware of this design flaw and didn't issue a recall. I'm sick to my stomach.[17]

56.    Many parents reported replacing the Car Seats due to their infants' discomfort and stated that they would not recommend either the Aria or the Mesa V2, believing that they presented a safety hazard.[18]

57.    At a minimum, UPPAbaby was aware of the design defect because it received direct and/or had access to complaints from consumers.  Additionally, similar complaints were posted to Defendant's website and to the website for the National Highway Safety Administration, which, upon information and belief, UPPAbaby monitored.

58.    Purchasers also contacted UPPAbaby's customer service to request a replacement car seat given the design defect.  In response, UPPAbaby admitted that it was aware of the issue, telling some complaining parents that that "some children are not sitting comfortably in the Mesa Max Infant Car Seat after the infant inlay is removed".  In response, however, it merely provided them with a two-piece foam kit "to ensure a better fit for a wider range of infants".

59.    UPPAbaby maintained that the foam kit would resolve the issue, despite continuing complaints and the serious nature of the risks described by parents.[19]

---

[17] elishevaku, *Hi all, I had a very similar experience with the MesaMax car seat... my baby cried non-stop as if he was in pain, face all red and purple and would sweat profusely* (Aug. 2024), Reddit (r/BabyBumpsCanada), https://www.reddit.com/r/BabyBumpsCanada/comments/1eng12z/uppababy_mesa_max_recall_on/(last visited Aug. 8, 2025)

[18] Google.com, Search results for "UPPAbaby Mesa Max car seat reviews" (discussing the Mesa Max), https://www.google.com/search?q=uppababy+mesa+max+car+seat+reviews (last visited Aug. 11, 2025).

[19] ConcernedParent123, *PSA: Do Not Use or Buy UPPAbaby Mesa Max Car Seat* (July 10, 2025), What to Expect (online forum), https://community.whattoexpect.com/forums/july-2025-babies/topic/psa-do-not-use-or-buy-uppababy-mesa-max-car-seat-168403817.html (last visited Aug. 8, 2025).

**In a Tacit Admission, UPPABaby Removes the Mesa Max from the Market
But Actively Conceals the True Reason for Doing So**

60.    UPPAbaby had access to consumer complaints, safety literature, and post-sale feedback confirming that the Mesa Max design created a risk of airway compromise. Nevertheless, it failed to issue a recall or notify existing purchasers. Instead, it allowed the model to "sell out" while replacing it with newer-generation designs.

61.    Rather than disclosing the true reason for withdrawing the Mesa Max, UPPAbaby continued to conceal the design defect, stating only that it was discontinuing the model to make room for other products.

62.    In an email to at least one customer, the UPPAbaby customer service team explained:

> We are continuously assessing our infant car seat category, and our focus remains on maintaining the quality of each product. After careful consideration and analysis, we have decided to phase out and discontinue the Mesa Max infant car seat.
>
> UPPAbaby has depleted their inventory. You can see if authorized retailers still have them available.[20]

63.    Defendant's claim of "continuous assessment" should have included the numerous complaints from parents describing the same serious concern: that the Car Seats forced infants into a slouched position, making it difficult for them to breathe safely.

---

[20] spencerawr, *FYI – UPPAbaby Has Discontinued the Mesa Max Due to Fit Issues* (May 29, 2024, 10:14 AM ET), Reddit (r/Buyingforbaby), https://www.reddit.com/r/Buyingforbaby/comments/1erb3f4/fyi_uppababy_has_discontinued_the_mesa_max_due_to (last visited Aug. 8, 2025).

64.     Even with this knowledge, Defendant failed to alert the public. It also took no action to prevent third-party retailers from continuing to sell the Mesa Max, despite having phased it out and knowing of its potential dangers.

65.     Similarly, UPPAbaby did not recall or stop producing the Aria or Mesa V2 or admit the design flaw in those seats despite repeated complaints about infants being forced to sit chin to chest.  In fact, it denied that these car seats suffered from the same design flaw, on certain websites, as alleged below.

## PLAINTIFF'S ALLEGATIONS

66.     Plaintiff purchased an Aria car seat for her soon to be born grandson from Amazon on or about December 2024 from her daughter-in-law's Babylist registry for her family's personal use and household use.

67.     The Aria was added to the Babylist registry only after extensive research was done, including a review of UPPAbaby's website, and various links that appeared on Babylist to ensure that her grandson had a safe car seat that would position him properly.  Ensuring proper infant positioning and overall product safety was a primary concern in selecting a car seat for Plaintiff and her daughter-in-law.

68.     The research that was performed included two promotional videos by UPPAbaby featured on Babylist, which misleadingly depicted infants as being properly positioned in the Aria car seat—appearing upright and comfortable.

69.     It also included a question under the Q&A section specifically addressing the design concerns of the seat.  One potential purchaser asked: "What has been adjusted in the UPPAbaby Aria to improve the seat design to address the chin to chest problem observed in the UPPAbaby Mesa?"

15

70.    In response Defendant responded:

The Aria has a different design since it's lightweight and is smaller than the Mesa products. It has a two-piece inlay consisting of a bottom cushion for a preemie or newborn, and a back inlay that will automatically adjust with the head support. ***The combination provides optimal body positioning***. (emphasis added).[21]

71.    Defendant made these and other representations with the intent that consumers like Plaintiff would rely on them in choosing to purchase the Aria. Defendant made such statements despite knowing that the Car Seats contained a potentially dangerous design defect.

72.    These statements and videos, along with UPPAbaby's website, were relied upon by Plaintiff and her daughter-in-law and misled them into believing that the Aria was safe and was free from design flaws and fit and suitable for the purpose for which it was purchased.

73.    Plaintiff reasonably expected the Aria would be of good and merchantable quality, and free of defects in materials and workmanship.  Plaintiff had no reason to know or believe that the Car Seat she was purchasing for her grandson would have a dangerous design defect that could jeopardize the safety and health of her grandson.

74.    Had Plaintiff known the truth about the Car Seats, and that the Aria suffered from the same design defects as other UPPAbaby models, Plaintiff would not have purchased it much less at the premium price that she paid.

75.    Based on the research performed and representations made in Defendant's warranty and marketing, Plaintiff and her daughter-in-law believed that the Aria would be a safe, reliable, and defect free choice.

---

[21] UPPAbaby**,** *Aria Light Fit Infant Car Seat* (blog post), *UPPAbaby*, https://uppababy.com/bumps-babies-blogs/car-seats/infant/aria/ (last visited Aug. 8, 2025).

76.    However, once Plaintiff's grandson was born and began using the Aria, it became apparent that the chin-to-chest positioning issue was present. The infant could not be seated in the Aria without his head slumping forward.

77.    Despite using the car seat in the usual manner and in the way recommended by UPPAbaby, and the fact that the instructions in the manual were followed, Plaintiff and her daughter-in-law repeatedly observed that the child's chin rested on his chest, and his head was pushed forward into a "C" position, causing visible discomfort.

78.    Plaintiff and her daughter-in-law, while concerned, presumed that this poor positioning was due to the infant's weak neck muscles, but were unaware until recently that this position was the result of a concealed design flaw.

79.    Since then, multiple reviews have been posted to the Aria section of the Babylist website which warn other parents about purchasing the Aria and leave little doubt that the design flaw has not been fixed, contrary to the company's statement in the Q&A.

80.    In fact, one parent wrote that after using the Aria, her child was not able to pass an O2 test, noting a lack of blood oxygen. *Id*.

81.    Another wrote under the heading "Bad Design" that the "car seat is very unsafe. I would not recommend this car seat due to its terrible design." *Id*.

82.    As with the Mesa Max, parents again complained that the seat made their infant sweaty, that the infant was "scrunched" in the seat, and were worried about asphyxiation. *Id*.

83.    Plaintiff is now taking steps to replace the Aria with a safer, more appropriately designed infant car seat.

## CLASS ALLEGATIONS

84.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and  all persons residing in the United States who purchased UPPAbaby's Aria, Mesa V2 or Mesa Max infant car seats, which were designed, manufactured, marketed, advertised and sold by Defendant during the period from February 2023 to the present (the "Class Period").

85.    Plaintiff further brings this action on behalf of a subclass of all persons residing in New Jersey, who purchased UPPAbaby Aria, Mesa V2 or the Mesa Max infant car seats during the Class Period (the "Subclass").

86.    Excluded from the Class are (1) Defendant, any parent, entity, member, or individual who has a controlling interest in Defendant or whom Defendant controls, and Defendant's legal representatives, officers, directors, assigns, and successors; and (2) the judge assigned to this action and any members of the  judge's immediate staff.

Numerosity

87.    The Class is so numerous that joinder of all members is impracticable. The Class consists of thousands of individuals throughout the United States. The precise number of Class members can only be ascertained through discovery, which includes Defendant's sales records. The disposition of these claims through a class action will benefit the parties and the Court.

88.    Common Questions of Law and Fact:  There are questions of law and fact common to the Class, and those questions predominate over any questions affecting only individual Class members. These common issues include, without limitation:

(a)    Whether Defendant is responsible for the marketing and advertising at issue;

(b)    Whether the marketing of Car Seats was false, misleading, deceptive, fraudulent, or unlawful;

(c)    Whether the Car Seats were sold at premium prices by Defendant given its misrepresentations and omissions;

(d)    Whether Defendant violated New Jersey law and/or applicable common law;

(e)    Whether Defendant breached express warranties made to Plaintiff and Class and/or Subclass;

(f)    Whether Defendant breached implied warranties;

(g)    Whether Defendant was unjustly enriched by its conduct; and

(h)    Whether Defendant's conduct as set forth above injured Plaintiffs and Class and Subclass members.

Typicality

89.    Plaintiff's claims and defenses are typical of the claims and defenses of the Class because Plaintiff and all Class members all purchased a Car Seat based upon the same course of deceptive statements and paid an additional price for these Car Seats based upon Defendant's deceptive statements.  Plaintiff and each Class Member purchased a Car Seat that contained a dangerous design flaw and failed to conform to Defendant's false and misleading statements.

Adequacy of Representation

90.    Plaintiff will fairly and adequately assert and protect the interests of the Class as:

(a)    Plaintiff has retained counsel who are experienced in prosecuting class action claims and will adequately represent the interests of the Class; and

(b)    Plaintiff has no conflicts of interest that will interfere with the maintenance of this class action.

Predominance

91.    With respect to the Class, or in the alternative, the Subclass, questions common to the Class predominate over those that only affect individual owners. This action involves the same set of deceptive statements and course of false advertising. Because the purchased Car Seats

contain a design flaw, that was concealed and failed to conform to the statements made, the value of those Car Seats has been reduced accordingly. Liability will be primarily predicated upon the jury's evaluation of Defendant's representations and/or advertisements regarding the safety of the Car Seats, the materiality of that feature, and the reduced value of those products given that design flaw or defect.

Superiority

92.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

(a)    The common questions of law and fact set forth above predominate over any questions affecting only individual Class Members;

(b)    The Class is so numerous as to make joinder impracticable but not so numerous as to create manageability problems. There are no unusual factual issues that would create manageability problems.

(c)    Prosecution of separate actions by individual Class Members would create the risk of inconsistent and varying adjudications against Defendant when confronted with incompatible standards of conduct;

(d)    The claims of individual Class Members are small in relation to the expenses of litigation, making a class action the only procedure in which Class members can as a practical matter, recover, and

(e)    A class action would be superior to and more efficient than adjudicating thousands of individual lawsuits.

**COUNT I**
**For Violation of New Jersey Consumer Fraud Act (N.J.S.A. §56:8-1, *et seq*.)**
**(on behalf of the New Jersey Subclass)**

93.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

94.     Plaintiff asserts this Count on behalf of the New Jersey Subclass defined above.

95.     Defendant and the New Jersey Subclass members are "persons" within the meaning of N.J. Stat. Ann. §56:8-1(d).  Defendant engaged in the "sale" of "merchandise" as defined in §56:8-1(c) and (e).

96.     The New Jersey Consumer Fraud Act ("CFA") makes unlawful "[t]he act, use or employment by any person of any person of any unconscionable commercial practice, deception fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of a material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandize or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby."  N.J. Stat. Ann. §56:8-2.

97.     In the course of its business, Defendant violated the CFA by knowingly misrepresenting and intentionally concealing material facts regarding the Car Seats, including their quality, safety and design. Specifically, Defendant engaged in one or more of the following deceptive practices:

(a)     Representing that the Car Seats possessed characteristics and benefits that they do not have;

(b)     Representing that the Car Seats have a particular standard or quality that they do not have;

(c)     Advertising the Car Seats with the intent not to sell them as advertised; and/or

(d)     Engaging in any other fraudulent or deceptive conduct likely to mislead or confuse reasonable consumers.

98.     Defendant's misrepresentations and omissions and concealment of the true characteristics of the Car Seats were material to Subclass Members. Defendant intended for consumers to rely on its omissions and misrepresentations, and Subclass Members reasonably did so. Had they known the truth, they would not have purchased the Car Seats or would not have paid a premium price.

99.     The Subclass members had no reasonable way to discover that Defendant's representation was false and misleading, or otherwise learning the true facts about the Car Seats' design defects that Defendant failed to disclose.

100.    Defendant had an ongoing duty to the Subclass Members to refrain from unfair deceptive business practices under the CFA and to disclose material facts. Defendant possessed exclusive knowledge of the design defect, intentionally concealed it, and made representations that were misleading in light of its failure to disclose the defect.

101.    As a direct and proximate result of Defendant's deceptive conduct, Subclass Members suffered ascertainable loss and actual damage, including overpayment and loss of the benefit of the bargain.

102.    Pursuant to N.J. Stat. Ann. §56:8-19, Plaintiff and the Subclass seek all available relief, including compensatory damages, treble damages, attorneys' fees, costs, and such other relief as the Court deems just and appropriate.

## COUNT II
### For Fraud by Omission or Fraudulent Concealment
### (On behalf of the Class and Subclass)

103.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

104.     Plaintiff and Class and Subclass Members purchased the Car Seats during the Class Period.

105.     Starting in or about 2023, Defendant knew or should have known that the Car Seats were defective in design and failed to meet the safety and quality standards represented to consumer and did not conform to the warranties.

106.     Defendant actively concealed and suppressed material facts regarding the defective design of the Car Seats from Plaintiff and Class and Subclass Members.

107.     Defendant knew that Plaintiff and Class and Subclass Members would not be able to inspect or otherwise detect the design defect through reasonable inspection prior to purchasing the Car Seats.

108.      At all relevant times, Defendant had a duty to disclose the defect due to its exclusive and superior knowledge of the issue, the dangerous nature of the defect, and its prior marketing statements and omissions. Defendant breached this duty by:

- Failing to disclose the defect;

- Making misleading safety and quality representations;

- Publishing marketing videos depicting properly positioned infants;

- Concealing the real reason for discontinuing the Mesa Max model.

109.    Defendant engaged in this course of conduct to intentionally assure consumers of the Car Seats' safety and design integrity, to preserve its reputation, avoid an expensive recall, and prevent consumers from learning the truth before purchase.

110.    These omissions and misrepresentations were material to consumers. They directly concerned the safety and comfort of the Car Seats and mislead consumers, including Plaintiff and Class Members into purchasing them and to pay a premium price.

111.    Defendant committed the foregoing acts and omissions in order to falsely assure purchasers of the safety and sound design of the Car Seats. Defendant concealed material information in order to preserve its reputation, avoid a costly and time-consuming recall, and prevent Plaintiff and Class and Subclass Members from learning of the defective nature of the Car Seats prior to their purchases. Defendant further failed to take adequate measures to rectify the issue.

112.    These false and misleading statements and omissions were material to Plaintiff and the Class and Subclass because they concerned the safety and reliability of the Car Seats and played a significant role in their decision to purchase the Car Seats and to pay a premium price.

113.    Defendant had a duty to disclose the defect in the Car Seats because it was known and/or accessible only to Defendant; Defendant had superior knowledge and access to the facts; and Defendant knew or should have known the facts that were not known to, or reasonably discoverable, by the Plaintiff and Class and Subclass Members. Defendant also had a duty to disclose material facts because it made many general affirmative representations about the quality, warranty, and lack of defects in the Car Seats, that were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding their actual quality.

114.    Defendant had exclusive control of the information related to the Car Seats, and the fact that they had a dangerous defect and were defective.  Plaintiff and Class and Subclass Members did not have a way to obtain any information regarding this defect. Defendant was aware that Plaintiff and Class and Subclass Members were relying on Defendant to provide them with complete information, as the sole source of actual data/testing information.  Despite Defendant's awareness of consumers' reasonable reliance, Defendant provided only partial, vague information quality of the Car Seats.

115.    As a result, Plaintiff and Class and Subclass Members were misled as to the true condition of the Car Sets at the time of purchase.  The omitted and concealed facts are material because they directly impact the value and use of the Car Seats and could result in a danger for their infants.

116.    Defendant actively concealed and/or suppressed these material facts, in whole or in part, to protect their reputation, avoid a recall, and sustain their marketing strategy and their revenues, and did so at the expense of Plaintiff and Class and Subclass Members.

117.    Had Plaintiff and Class and Subclass Members known the truth that the Car Seats were defective, they would not have purchased them much less at the price that they paid. Plaintiff and Class and Subclass Members would have been in a position such that they would have been aware of those disclosures at or before the time of their purchase.

118.    Defendant omitted, suppressed, or concealed material facts of the defects in the Car Seats, leading to the same result: Plaintiff and Class and Subclass Members suffered pecuniary injuries proximately caused by Defendant's suppression of material facts, and those injuries are ascertainable, quantifiable, and exceed $5,000,000.

## COUNT III
### Breach of Express Warranty
### (on Behalf of the Class and Subclass)

119.    Plaintiff realleges each and every allegation above as if fully set forth herein.

120.    Plaintiff brings this claim individually and on behalf of all Class and Subclass Members.

121.    Defendant expressly warrantied that the Car Seats were  free from defects and made uniform representations about the quality, safety, comfort and functionality of the Car Seats in product packaging, online marketing, manuals, and advertising. These representations included, but were not limited to, assurances that the Car Seats:

- Were free from defects in materials and workmanship;

- Were safe for infant use;

- Would properly position infants to ensure their safety and comfort;

- Would provide peace of mind to parents and caregivers; and

- Would not place infants in a "C" position that could lead to discomfort or asphyxiation, among other conditions.

122.    These representations constituted express warranties under applicable law and formed part of the basis of the bargain between Plaintiff (and Class/Subclass members) and Defendant. Plaintiff and Class and Subclass Members relied upon these representations in deciding to purchase the Car Seats.

123.    Defendant breached its express warranties by selling Car Seats that failed to conform to the stated representations. Specifically, the Car Seats were defective in design, unsafe, unmerchantable and unsuitable for their intended purpose.

124.    To the extent required by law, Plaintiff and New Jersey Subclass Members allege that they have satisfied all pre-suit notice requirements, or that such notice is excused. Defendant had actual knowledge of the defect through consumer complaints, warranty claims, internal testing, and safety reports, and thus formal pre-suit notice was unnecessary. In the alternative, any requirement of pre-suit notice is excused because providing such notice would have been futile in light of Defendant's ongoing concealment of the defect and refusal to provide an adequate remedy.

125.    As a direct and proximate result of Defendant's breach of warranty, Plaintiff and Class and Subclass Members suffered economic damage, including overpayment, loss of product value, and loss of the benefit of their bargain.

126.    Plaintiff and the Class/Subclass seek compensatory damages in an amount to be determined at trial, and, to the extent permitted by law, punitive damages based on Defendant's knowing and intentional misrepresentations concerning the nature and safety of the Car Seats.

## COUNT IV
## Breach of Implied Warranty
## (on Behalf of the Class and Subclass)

127.    Plaintiff realleges and incorporates by reference all prior allegations as though fully set forth herein.

128.    Plaintiff brings this claim individually and on behalf of the members of the Class and Subclass against Defendant.

129.    Defendant is a merchant regularly engaged in the business of manufacturing, marketing, distributing, and selling car seats and at all relevant times held itself out as having specialized knowledge and skill with respect to such goods.

130.    Plaintiff and Class and Subclass Members purchased the Car Seats as end-use consumers, for the ordinary and foreseeable use of such products—i.e., to safely transport infants, and as suitable for regular personal and household use. Alternatively, Plaintiff and Class Members purchased the Car Seats for the specific purpose of obtaining a product that conformed to Defendant's representations, including that the Car Seats were safe and comfortable.

131.    Defendant, as the manufacturer and seller, knew or had reason to know the ordinary and particular purposes for which Plaintiff and the Class and Subclass intended to use the Car Seats and knew that purchasers were relying on Defendant's skill and judgement in providing suitable and safe products.

132.    Defendant breached the implied warranty of merchantability by selling Car Seats that were defectively designed and unfit for their ordinary use. The Car Seats posed foreseeable risks to infant safety and failed to meet the expectations of reasonable consumers.

133.    Defendant also breached the implied warranty of fitness for a particular purpose. Plaintiff and Class/Subclass Members relied on Defendant's representations and expertise, and the Car Seats failed to perform as intended or as promised.

134.    To the extent required by law, Plaintiff and New Jersey Subclass Members allege that they have satisfied all pre-suit notice requirements, or that such notice is excused. Defendant had actual knowledge of the defect through consumer complaints, warranty claims, internal testing, and safety reports, and thus formal pre-suit notice was unnecessary. In the alternative, any requirement of pre-suit notice is excused because providing such notice would have been futile in light of Defendant's ongoing concealment of the defect and refusal to provide an adequate remedy.

135.    As a direct and proximate result of Defendant's breaches, Plaintiff and Class members suffered economic injury, including overpayment, diminished product vale, and  loss

of the benefit of the bargain, and would not have purchased the Car Seats—or would have paid significantly less—had the true nature of the products been disclosed.

## COUNT V
### Violation of the Magnuson-Moss Warranty Act
### (15 U.S.C. § 2301, et seq.)
### (on Behalf of the Class and Subclass)

136.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

137.    Plaintiff brings this claim individually and on behalf of the Class and Subclass against Defendant pursuant to the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, et seq.

138.    The Car Seats are "consumer products" as defined in 15 U.S.C. § 2301(1), because they are tangible personal property distributed in commerce and normally used for personal, family, or household purposes.

139.    Plaintiff and Class and Subclass Members are "consumers" as defined in 15 U.S.C. § 2301(3), because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its warranties.

140.    Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2301(4)–(5), because it is engaged in the business of making consumer products available to consumers and gives or offers written warranties with respect to its products.

141.    Defendant provided "written warranties" within the meaning of 15 U.S.C. § 2301(6), including but not limited to:

a. The "Product Lifetime Warranty," under which Defendant warranted that the Car Seats were "free from manufacturing defects" when operated under normal use and in compliance with instructions; and
b. Uniform affirmations and promises made in product packaging, on Defendant's website, and in marketing materials, including that the Car Seats were safe, free from

29

defects, suitable for safely transporting infants, and would position infants properly without causing discomfort or airway restriction.

142.    These warranties became part of the basis of the bargain between Defendant and Plaintiff/Class/Subclass Members.

143.    Defendant breached these warranties by selling Car Seats that were not free from defects, were not safe, and did not conform to the affirmations and promises made. Instead, the Car Seats suffered from a dangerous design defect that forced infants into a "C-shape" position that could impair breathing, rendering the products unfit for their intended purpose and unmerchantable.

144.    Defendant was given reasonable opportunity to cure its breaches of warranty but failed to do so. Defendant continued to sell the Car Seats without disclosing the defect, refused to recall them, and failed to provide a repair or replacement that would conform to the warranties.

145.    To the extent required by law, Plaintiff and New Jersey Subclass Members allege that they have satisfied all pre-suit notice requirements, or that such notice is excused. Defendant had actual knowledge of the defect through consumer complaints, warranty claims, internal testing, and safety reports, and thus formal pre-suit notice was unnecessary. In the alternative, any requirement of pre-suit notice is excused because providing such notice would have been futile in light of Defendant's ongoing concealment of the defect and refusal to provide an adequate remedy.

146.    As a direct and proximate result of Defendant's breaches of warranties under the MMWA, Plaintiff and Class/Subclass Members have suffered damages, including but not limited to overpayment, diminished value of the Car Seats, and loss of the benefit of their bargain.

147.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and the Class/Subclass seek damages and other legal and equitable relief, and pursuant to § 2310(d)(2), Plaintiff seeks costs and expenses, including reasonable attorneys' fees.

**COUNT VI**
**Unjust Enrichment**
**(on Behalf of the Class and Subclass)**

148.    Plaintiff realleges and incorporates by reference all prior allegations as though fully set forth herein.

149.    To the extent required by law, this cause of action is pled in the alternative to Plaintiff's legal claims, pursuant to Fed. R. Civ. P. 8(d)(2).

150.    Plaintiff and Class Members conferred a direct and substantial benefit on Defendant by purchasing the Car Seats and paying a premium based on Defendant's representations regarding safety, comfort, and quality.

151.    Defendant knowingly accepted and retained the revenues derived from these purchases, despite the fact that the Car Seats did not conform to Defendant's representations regarding safety and comfort and were defective in design.

152.    Retention of these benefits is unjust and inequitable, as Defendant's misrepresentations and omissions induced Plaintiff and Class members to purchase Car Seats that were not as represented.

153.    As a result, Plaintiff and Class members suffered harm, including overpayment and loss of the benefit of their bargain.

154.    Defendant's retention of these non-gratuitous benefits violates principles of justice, equity, and good conscience, and thus constitutes unjust enrichment in an amount to be determined at trial.

155.    Plaintiff and Class members lack an adequate remedy at law to fully address the harm caused by Defendant's wrongful conduct.

## **JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in her favor and in favor of the Class as follows:

A.    An order certifying the proposed Class and Subclass; appointing Plaintiff as the Class and Subclass representative, and appointing Plaintiff's undersigned counsel as counsel for the Class and Subclass;

B.    An order declaring that Defendant's conduct violates the statutes and claims referenced herein;

C.    An order awarding monetary damages, including actual damages, statutory damages, compensatory and punitive damages, in the maximum amount provided by law under the common law and the statutes named herein;

D.    Injunctive relief;

E.    An order for prejudgment interest on all amounts awarded;

F.    An order awarding Plaintiff and the other Class and Subclass Members the reasonable costs and expenses of suit, including their attorneys' fees; and

G.    Any further relief that the Court may deem appropriate.

DATED:  August 12, 2025                    Respectfully submitted,

By: _____

**KANTROWITZ, GOLDHAMER &**
**GRAIFMAN, P.C.**
Gary S. Graifman
Melissa R. Emert
135 Chestnut Ridge Road
Suite 200
Montvale, NJ 07645
Telephone : 201-391-7000
Facsimile : 201-307-1086
ggraifman@kgglaw.com
memert@kgglaw.com

**TheGrantLawFirm, PLLC**
Lynda J. Grant
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: 212-292-4441
Fax: 212-292-4442
lgrant@grantfirm.com

***Attorneys for Plaintiff***