[Docket No. 26]

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

<table>
<tr><td>

THERESA JACOBS, *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

MONAHAN PRODUCTS, LLC, *d/b/a* UPPABABY,

Defendant.

</td><td>

No. 25-CV-14538 (RMB)

**OPINION**

</td></tr>
</table>

**RENÉE MARIE BUMB, Chief United States District Judge**

Parents trust car seats to protect their children. Plaintiff Theresa Jacobs ("Plaintiff" or "Jacobs") alleges certain car seats made by Defendant Monahan Products, LLC ("UPPAbaby") hurt them instead. Jacobs claims UPPAbaby sold the Aria, Mesa V2, and Mesa Max car seats knowing they were a danger to their occupants. [*See, e.g.*, Docket No. 1 ¶¶ 2–3, 8.] But it is not enough to allege a product is dangerous. Jacobs must plausibly allege ***why*** and ***how*** the car seats were dangerous to pass muster under Federal Rule of Civil Procedure 12.

Jacobs alleges the why—infants can slip into a slouched position leading to asphyxiation—but assumes the how. Jacobs's assumptions are just that: assumptions. She assumes all UPPAbaby car seats are created equal while in the same breath alleging UPPAbaby manufactured three different models, not just with three different

names but with three different sets of features and specifications.  Jacobs does not adequately explain *with facts* how these three different car seats' designs caused infants to assume a dangerous "C-shaped" position as opposed to something else, like misuse or improper consumer installation of foam inserts that she alleges UPPAbaby provides to help properly position infants.  Because Jacobs does not plead enough facts to nudge her claim from conceivable to plausible, and for the other reasons discussed in detail below, Jacobs's claims must fail as plead.

Jacobs brings six claims on behalf of herself and a putative class of nationwide purchasers of all three car seats.  [Docket No. 1 at ¶ 84.]  In her two fraud-based claims—one under the New Jersey Consumer Fraud Act ("NJCFA") and one under New Jersey common law[1]—she alleges that to keep sales high, UPPAbaby concealed the Aria, Mesa V2, and Mesa Max's design defects while claiming the car seats were safe and comfortable.  [*Id.* ¶¶ 93–118.]  Next, Jacobs claims UPPAbaby breached its express "Product Lifetime Warranty," and the implied warranty of merchantability, creating liability under the Magnuson-Moss Warranty Act ("MMWA").  [*Id.* ¶¶ 119–147.]  Jacobs further alleges the same advertisements and promotional materials used to conceal the car seats' defects created a separate express warranty, [*id.*; *see also* Docket No. 27 at 14–15], and an implied warranty of fitness for a particular purpose, [Docket

---

[1] Because the parties extensively cite New Jersey law, and neither suggests any other state's law should govern, New Jersey law applies.  *See, e.g.*, *Schmidt, Long & Assocs., Inc. v. Aetna U.S. Healthcare, Inc.*, 2000 WL 1780231, at *2 n.3 (E.D. Pa. Dec. 4, 2000).

No. 1 ¶¶ 131–133].  Finally, Jacobs pleads unjust enrichment in the alternative, arguing even if her other claims fail, UPPAbaby should not be permitted to retain the car seats' full sales price when she received a defective product.  [Docket No. 1 ¶¶ 148–155.]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

UPPAbaby manufactures and sells a wide range of products for infants and toddlers, including strollers, high-chairs, and—at issue here—car seats.[2]  Although the three products share some features,[3] each car seat appears to target separate markets and possess distinctive features.  For example, the Mesa V2 retails between $80 to $100 less than the Mesa Max,[4] and is advertised as a more wallet-friendly option.[5]  The Aria, on the other hand, prioritizes weight-savings for parents on the go and touts its sub-six-pound frame.[6]

---

[2]  *About Us*, UPPABABY, https://uppababy.com/our-company/our-story/ (last visited July 24, 2026).

[3]  *UPPAbaby's Infant Car Seat Guide: Comparing the Mesa V2, Mesa Max, and Aria*, UPPABABY (March 1, 2024), https://uppababy.com/blog/uppababys-infant-car-seat-guide-comparing-mesa-v2-mesa-max-and-aria/.

[4]  *Compare Mesa V2*, UPPABABY, https://uppababyweb.uppababy.com/mesa/ (last visited July 24, 2026) (M.S.R.P. of $329.99) *with Mesa Max*, UPPABABY, https://uppababyweb.uppababy.com/product/mesa-max/ last visited July 26, 2026) (M.S.R.P. between $399.99 and $429.99).

[5]  *UPPAbaby's Infant Car Seat Guide*, *supra* note 2 ("For parents who are searching for . . . a great value.").

[6]  *Id.* ("For parents who are prioritizing a lightweight design[.]")

Jacobs bought an Aria car seat for her soon-to-be-born grandson in December 2024. [Docket No. 1 ¶ 66.] Jacobs purchased an Aria from her daughter-in-law's "Babylist," [*id.* ¶ 66], an online registry allowing parents to investigate products and create a wish list for their newborn.[7] Notably, Jacobs only bought an Aria—she does not allege she purchased either the Mesa V2 or Mesa Max. Jacobs's daughter-in-law chose to list the Aria on her Babylist after performing "extensive research . . . including a review of UPPAbaby's website [and] promotional videos by UPPAbaby." [*Id.* ¶¶ 67–68.] Despite her "extensive research" Jacobs does not allege either she or her daughter-in-law saw any negative reviews ***before*** purchasing the Aria. [*Id.* ¶ 67]. According to Jacobs, other customers' negative reviews on Babylist describing similar problems only came ***after*** she made her purchase.[8] [*Id.* ¶ 79.]

Things soured after Jacobs's grandson was born and Jacobs could not position him in the Aria properly. When she tried, he assumed a dangerous chin-to-chest position with "his head [] pushed forward into a 'C' position, causing visible discomfort." [*Id.* ¶¶ 76–77.] Jacobs filed her Complaint in this Court on August 12, 2025. [Docket No. 1.] The parties appeared for a premotion conference pursuant to this Court's judicial preferences in November where UPPAbaby sought leave to file a

---

[7] *About Babylist*, https://www.babylist.com/about (last visited July 24, 2026).

[8] The Aria's page on Babylist is no longer available. The Court's efforts to find the Babylist complaints on the Way Back Machine proved unavailing. Regardless, the Court must take Jacobs's factual allegation as true at the motion to dismiss stage. *U.S. Sec. and Exch. Comm'n v. Mintz*, 723 F. Supp. 3d 386, 398 (D.N.J. 2024).

motion to dismiss. [Docket No. 21.] The Court granted leave, and UPPAbaby moved to dismiss Jacobs's Complaint pursuant to Rule 12(b) in December 2025. [Docket Nos. 25–26.] Jacobs's opposition and UPPAbaby's reply in further support followed in January and February 2026 respectively. [Docket Nos. 26–27.] The motion is ripe for disposition.

## II.   JURISDICTION

Jacobs claims jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). Jacobs is a resident of New Jersey, [Docket No. 32], and UPPAbaby is at least a citizen of Massachusetts and Delaware, but critically it is not a citizen of New Jersey, [Docket No. 31], satisfying CAFA's minimal diversity requirement, *Gallagher v. Johnson & Johnson*, 169 F. Supp. 3d 598, 602 (D.N.J. 2016). Jacobs seeks to represent a nationwide class of more than 100 plaintiffs and claims more than $5,000,000.00 in damages. UPPAbaby filed its Rule 12 motion without challenging this Court's personal jurisdiction, thus submitting to it. Venue is proper because Jacobs purchased the car seat from and used it at her Marlton, New Jersey home. 28 U.S.C. § 1391(b)(2).

## III.   LEGAL STANDARD

Courts must dismiss claims "upon which [no] relief can be granted." FED. R. CIV. P. 12(b)(6). Assessing whether "relief may be granted" employs the familiar *Iqbal / Twombly* factual plausibility standard: A complaint must contain sufficient **factual** material to **plausibly** meet the elements of a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff need not plead detailed factual allegations, but

she *must provide more than labels and conclusions*:  "[A] formulaic recitation of the elements of a cause of action will not do."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing id.*).  Courts must take all facts in the light most favorable to the plaintiff, *i.e.*, accept factual allegations in the complaint as true as well as all *reasonable* inferences that can be drawn from them.  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790–91 (3d Cir. 2016).  But courts may freely disregard a plaintiff's legal conclusions.  *Id.*

A Rule 12(b)(6) motion challenges the sufficiency of plaintiff's claims, not her ultimate success.  Instead of determining "whether a plaintiff will ultimately prevail[,]" *Twombly*, 550 U.S. at 563 n.8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)), these motions ask whether a plaintiff's claims are plausible, thus entitling "the claimant [] to offer evidence to support the claims," *id.*  Plausibility is a meaningfully higher standard than mere conceivability.  *See id.* at 546 ("The 'no set of facts' [standard] is best forgotten as an incomplete, negative gloss[.]").  "It is not akin to probability, but it asks for more than sheer possibility.  Where a complaint pleads facts that are merely consistent with defendant's liability, it stops short of plausibility."  *Iqbal*, 556 U.S. at 679 (citation modified); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

To that end, this Court follows the three-step process set down by the Third Circuit to evaluate claims at the motion to dismiss stage:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Third, "whe[n] there are well-pleaded factual

allegations, a court should assume their veracity and then determine
whether they plausibly give rise to an entitlement for relief."

*Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (*quoting Iqbal*, 556 U.S. at 664, 675,

679 (alterations in original)).

## IV.   DISCUSSION

Once conclusory labels and facts about car seats that Jacobs never bought are
stripped away, Jacobs's Complaint does not "plausibly give rise" to any claim upon
which relief can be granted.  Jacobs's biggest shortcoming—one that infects most of
her claims—is a failure to plead plausible and non-conclusory ***facts*** from which the
Court may infer whether she is entitled to relief.  Although *Iqbal* and *Twombly* do not
require detailed engineering mock-ups or an expert-level analysis at the pleading stage,
they do require factual allegations that plausibly identify the characteristic rendering a
product defective—labels alone are insufficient.  *Iqbal*, 556 U.S. at 678–79.

Jacobs frequently labels the various car seats "defective" and identifies an
alleged effect, *i.e.*, the dangerous "C-shaped" slump infants experience, but she never
sufficiently pleads what is wrong with the car seats to cause it.  Moreover, permeating
throughout her pleadings is the notion that all "C-shapes" are identical, a conclusion
unsupported by factual allegations.  This is all fatal to many of her claims—including
her attempt to gain standing for car seats she never purchased.

**A.    Jacobs's failure to identify a common defect across UPPAbaby car seats forecloses her ability to bring claims relating to the Mesa V2 and Mesa Max.**

Standing is never dispensed in gross, and plaintiffs must present a concrete, particularized harm as to ***each claim for each plaintiff***. *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 459 (3d Cir. 2024). Jacobs never bought, owned, or used either the Mesa V2 or Mesa Max car seat. Under a traditional standing analysis, Jacobs patently lacks standing to bring claims regarding the Mesa V2 or Mesa Max because she cannot "fairly trace" injuries to products she never bought or used. *Lieberson v. Johnson & Johnson Consumer Cos.*, 865 F. Supp. 2d 529, 537 (D.N.J. 2011).

Although class claims generally do not alter the standing analysis, *id.* ("The standing inquiry does not change in the context of a putative class action. . . . [S]tanding cannot be predicated on an injury which the plaintiff has not suffered, nor can it be acquired through the back door of a class action.") (alterations in original) (quoting *Koronthaly v. L'Oreal*, 2008 WL 2938045, at *4 (D.N.J. July 29, 2008)), there are instances where courts permit a class representative to lump similar products together—even if the class representative did not purchase all of them. *See generally Haas v. Pittsburgh Nat. Bank,* 526 F.2d 1083 (3d Cir. 1975) (creating the exception with financial products) (hereinafter referred to as the "*Haas* exception"); *In re Subaru Battery Drain Prods. Liab. Litig.*, 2021 WL 1207791, at *7 (D.N.J. March 31, 2021) (detailed history of this District's application of *Haas* in product liability actions).

But courts do not allow the *Haas* exception as a matter of right. ***First***, plaintiffs must demonstrate their claims share a basis and that the unpurchased products are

8

closely related to the purchased product.[9]  *Id.*  The theory being, if the same design defect pervades multiple products, a plaintiff who experienced the common defect may adequately represent a class, even if they did not buy *every* defective product.  *See, e.g.*, *Powell v. Subaru of Am., Inc.*, 502 F. Supp. 3d 856, 873 (D.N.J. 2020) (where multiple Subaru models used the same defective windshield, named plaintiff need not have purchased each defective Subaru model).

Product liability actions invoking the *Haas* exception mostly fall into one of two buckets:  *mislabeled food products* or *automobiles tainted by defective components*.  Take *Stewart v. Smart Balance, Inc.*, which Jacobs relies on to point the Court towards the *Haas* exception.  There, consumers suspecting fat-free milk tasted too good to be true sued the milk's manufacturer.  2012 WL 4168584, at *1 (D.N.J. June 26, 2012). Plaintiffs' alleged harms, if proven, were uniformly caused by the fat-free product *containing fat*.  *Id.*  In another food case, a variety of different diet chocolate bars allegedly contained 20–30% more calories than advertised.  *Burke v. Weight Watchers Int'l, Inc.*, 983 F. Supp. 2d 478, 482 (D.N.J. 2013).  In both cases, the similar—if not identical—objectively observable characteristic across related products justified maintaining the action with the current class representative, their non-purchase

---

[9] The *Haas* exception also requires claims about separate but closely related products be asserted against the same defendant. *Subaru Battery Drain*, 2021 WL 1207791 at *7. That factor is not in dispute because UPPAbaby manufactures the Aria, Mesa V2, and Mesa Max.  [*See generally* Docket No. 1.]

notwithstanding.  But those cases do not allege design defects like Jacobs does here. Instead, they allege a common adulteration of sorts.

The automobile cases present a different distinction with the same kind of objectively observable issue.  The allegedly defective design is a common component failing across multiple vehicle models.  Windshields and batteries are repeat examples, *Powell*, 502 F. Supp. 3d at 873; *Reinkraut v. FCA US, LLC*, 2024 WL 4052986, at *10 (D.N.J. Sept. 5, 2024) (defective windshields across Jeep models); *Burbank v. BMW of N. Am., LLC*, 2022 WL 833608, at *3 (D.N.J. Mar. 21, 2022) (batteries in BMWs), but other components are also susceptible to lumping, *see, e.g.*, *Cox v. Chrysler Grp., LLC*, 2015 WL 5771400, at *1, *15 (D.N.J. Sept. 30, 2015) (Chrysler sunroofs).  Jacobs's claims do not fit into this bucket either.  She does not allege an objectively identifiable component shared across car seats caused her harm, but rather, she identifies the *subjective* effect:  a slumping infant.[10]

Comparing those automobile cases with another where a court ***declined*** to apply the *Haas* exception further illustrates the logic.  In a different Subaru case, plaintiffs alleged that a software "fix" for over-revving turbochargers caused their cars to "uncontrollably surge or stall" after installation.  *Sauer v. Subaru of Am., Inc.*, 2020 WL

---

[10] *Haas* applies to other products as well, but the logic behind its application almost always mirrors the logic in the food or automobile cases.  For example, when various baby food products all contained ***the same*** proprietary probiotic bacteria, plaintiffs' claims proceeded despite their not having purchased every afflicted product.  *In re Gerber Probiotic Sales & Practices Litig.*, 2014 WL 5092920, at *6 (D.N.J. Oct. 10, 2014). That is the logic of the automobile cases:  A bad component tainted the whole line.

1527779, at *1 (D.N.J. Mar. 31, 2020).  Without allegations "the fix" affected the various Subaru models at issue in the same way, the court could not find all the models were closely related.  *Id.* ("[T]he principles considered in *Haas* and *Gerber* are not present. . . . Plaintiff fails to allege sufficiently that the basis for her claims, relating to all Class Vehicles, is the same or that the vehicle's engines are closely related.").

The cases applying the *Haas* exception leave no room for debate:  The alleged defect is objectively identifiable across every product at issue.  Whether a food product contains fat despite being labeled fat-free or whether multiple vehicles contain the same defective windshield, the existence of the common defect does not depend upon inferences or varying consumer experiences.   The products either shared the characteristic or they did not.  Compare that objective observability with the subjective terminology Jacobs uses here.  "C-shaped" does not necessarily establish a common condition.  Just as different people may draw the letter "C" with materially different curvatures, consumers may use "C-shaped" to describe materially different infant postures or car seat geometry.

The Complaint does not allege facts showing that infants' reported postures were sufficiently uniform across products to support an inference that the three car seats share the same defect.  It describes the subjective "C-shaped" position infants *can* assume in UPPAbaby's car seats, but it does not explain *how* that is so.  Jacobs does not allege the three car seats share the same shell, mold, seating geometry, insert, buckle, recline mechanism, or other common design feature that purportedly causes

infants to assume the "C-shaped" position.   That "how" is the nub of the *Haas* exception.  In the food product cases, it was inclusion of fat or calories advertised as absent in each product.  In the automobile cases, it was a failing component common to multiple car models.

Instead, Jacobs's argument boils down to "the infant slumped forward, therefore the car seat must be defective."  Jacobs relies on a common label to establish both a common manifestation and a common defect.  But the term "C-shaped" does not itself establish that infants assumed materially identical postures, and even identical postures would not, without more, establish that the three differently designed seats share the same causative design characteristic.  That inference is insufficient.  She must do more.

Even if the Court were inclined to apply the *Haas* exception, Jacobs's Complaint includes allegations the Aria ***was not*** closely related to other UPPAbaby car seats. Jacobs pleads the Aria included a "two-piece robust infant insert," [Docket No. 1 ¶ 46], that the Mesa V2 did not.  And later in the Complaint, Jacobs pleads UPPAbaby's express affirmation ***the Aria has a different design than both Mesa car seats***.  [*Id.* at ¶ 70.] Although Jacobs alleges that statement is false—arguing UPPAbaby made it while knowing the Aria suffered from a design defect, [*id.* at ¶ 71]—she rests her arguments on assumption after assumption about UPPAbaby's intent instead of facts, let alone facts that satisfy Rule 9's heightened pleading standard for fraud.  FED. R. CIV. P. 9(b). Further, the sheer volume of Jacobs's citations to Mesa Max complaints, [*see, e.g., id.*

12

¶¶ 37–38, 54 n.16, 55, 56 (referring the Aria, but citing Mesa Max complaints), and more], compared to *two* about the Aria, [*id.* ¶¶ 80–81], renders Jacobs's assertions that the car seats are closely related implausible.

The Court's holding is consistent with another case alleging the same "C-shaped" defects against UPPAbaby in California—one that found plaintiffs lacked standing *twice*. *Mossazadeh v. Monahan Prods., LLC* [*Mossazadeh I*], 2025 WL 3211457, at *7 (C.D. Cal. Oct. 9, 2025); *Mossazadeh v. Monahan Prods., LLC* [*Mossazadeh II*], 2026 WL 413739, at *2–3 (C.D. Cal. Jan. 14, 2026). There, plaintiffs sued UPPAbaby for alleged defects in the same three car seats Jacobs does here: the Aria, Mesa V2, and Mesa Max. 2025 WL 3211457 at *1; 2026 WL 413739 at *2–3. Applying the Ninth Circuit's *Haas* analog, the Central District of California held Mossazadeh could only pursue claims for herself and a class of customers who purchased the seat she bought— the Mesa Max. 2025 WL 3211457 at *7; 2026 WL 413739 at *2–3. Even after a second bite at the apple, Mossazadeh's efforts failed to plead *facts* allowing the court to evaluate the alleged similarity of three different car seat designs:

> The new allegation that the products are all "similar" is conclusory and lacks sufficiently detailed facts that the non-purchased products are substantially similar to the purchased products for which Plaintiffs have standing. . . . Plaintiffs argued that the diagrams attached to the FAC sufficiently put Defendant on notice . . . [b]ut the FAC contains no allegations actually discussing the diagrams or explaining how any visual similarity between the models plausibly means that a specific defect is present across them. . . . Even assuming the diagrams demonstrate that the models are physically similar, Plaintiffs have not plausibly alleged that the models suffer from substantially the same

13

> defect or that the relevant injury to the customer is the same. . . . While the FAC includes customer reviews of the Mesa V2 and Aria models, as discussed in [*Mossazadeh I*], those reviews do not clearly discuss the same alleged defect to which this lawsuit is directed.

2026 WL 413739 at *2–3 (internal quotation marks and citations omitted).[11]

The Court's ruling on standing mirrors *Mossazadeh*'s in the face of even fewer factual allegations. Jacobs did not include diagrams or even a description of the physical similarities of the three different car seats. As a result, "group pleading" harms from multiple car seats here is improper. The Court will ***only*** consider the Complaint's factual averments about the Aria, and any class claims premised on allegations about the Mesa V2 and Mesa Max are dismissed.

---

[11] On her third try, the court allowed Mossazadeh to group the Aria, Mesa V2, and Mesa Max together. *Mossazadeh v. Monahan Prods., LLC* [*Mossazadeh III*], 2026 WL 2109037, at *2 (C.D. Cal. April 29, 2026). The Court found the minimal factual allegation that all three car seats "share substantially similar curvatures and contours on the surface where the infant rests, creating a 'C'-shaped surface" plausibly linked the three car seats. *Id.*

The Court need not decide whether that allegation would satisfy *Haas*. Jacobs's Complaint does not contain ***any*** similar factual allegations permitting the Court to infer the Aria closely resembles the Mesa V2 or Mesa Max. Indeed, the allegations in Jacobs's Complaint resemble the example *Mossazadeh III* distinguished as insufficient pleading. *Id.* at *3 ("[T]he plaintiff only listed unpurchased products . . . and merely asserted in a conclusory fashion that they "are all basically the same.") (quoting *Wilson v. Frito-Lay N. Am., Inc.*, 961 F. Supp. 2d 1134, 1141 (N.D. Cal. 2013)).

**B.    UPPAbaby's advertisements and promotional materials about the Aria are not actionable under New Jersey law.**

Four of Jacobs's claims implicate statements made by UPPAbaby about the Aria. For her NJCFA claim, Jacobs alleges UPPAbaby represented the Aria possesses "characteristics, benefits, standards, and quality" that they do not, and UPPAbaby "advertised car seats with the intent not to sell them as advertised."[12] [Docket No. 1 ¶ 97.] Next, she claims UPPAbaby fraudulently concealed defects when they made "misleading safety and quality representations." [*Id.* ¶ 108.] Jacobs also argues the totality of UPPAbaby's advertisements and other promotional materials create an express warranty separate and apart from the express warranty UPPAbaby provides its customers. [*See id.* ¶ 119–126; Docket No. 27 at 14–15.] Finally, Jacobs claims UPPAbaby's representations created an implied warranty for a particular purpose. [Docket No. 1 ¶ 130.]

1.    *Most of the statements Jacobs claims create fraud-based claims and a separate express warranty are marketplace puffery and are not actionable.*

Jacobs's Complaint alleges UPPAbaby made the following specific statements *about the Aria*:

| 1 | [The Aria] was designed to define new standards of safety and convenience in the realm of easy-to-carry baby gear. | ¶ 45 |

---

[12] Jacobs also lists "engaging in any other fraudulent or deceptive conduct likely to mislead or confuse reasonable consumers." The Court disregards this allegation of fraud because Jacobs did not plead it with particularity. FED. R. CIV. P. 9(b).

| 2 | Its strong yet light build with SmartSecure technology, Anti-Bound+Panel, and extra-large canopy provides a safe and comfortable ride for baby. | ¶ 45 |
|---|---|---|
| 3 | [The Aria provides] an optimized fit suitable for preemies. | ¶ 46 |
| 4 | The two-piece robust infant insert ensures proper body positioning for infants weighing as little as 4lbs [sic]. | ¶ 46 |
| 5 | The Aria has a different design since it's lightweight and is smaller than the Mesa products. | ¶ 70 |
| 6 | It has a two-piece inlay consisting of a bottom cushion for a preemie or newborn. | ¶ 70 |
| 7 | A back inlay that will automatically adjust with the head support. | ¶ 70 |
| 8 | The combination provides optimal body positioning. | ¶ 70 |

"Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993); *see, e.g., In re Toshiba Am. HD DVD Mktg. and Sales Prac. Litig.*, 2009 WL 2940081, at *15 (D.N.J. Sept. 11, 2009) (Toshiba's "Today, Tomorrow, and Beyond" was puffery); *Rodio v. Smith*, 587 A.2d 621, 624 (N.J. 1991) (Allstate's "You're in good hands" also puffery). When marketing language constitutes puffery, that language: (1) cannot form the basis of an NJCFA claim, *Lieberson*, 865 F. Supp. 2d at 540 (collecting cases); expresses opinions that do not violate common law fraud principles, *Ludwig v. FCA US LLC*, 795 F. Supp. 3d 525, 553 (D.N.J. 2025); and lacks the specificity needed to create an express warranty, *Renavitz v. Boar's Head Provision Co.*, 2025 WL 2506138, at *5

16

(D.N.J. Sept. 2, 2025).  The hallmarks of an *actionable* statement, *i.e.*, one that is not mere puffery, are specificity and measurability by comparative research—and both must be present.  *Castrol*, 987 F.2d at 945–46; *Lieberson* 865 F. Supp. 2d 529.

Statements 1, 2, and 8 are sufficiently "broad, vague, and commendatory" that they are nothing more than puffery.  "Designed to define new standards of safety and convenience" is quintessential puffery resembling "Toshiba's Today, Tomorrow, and Beyond" or Allstate's "You're in good hands."  2009 WL 2940081, at *15; 587 A.2d at 624.  Although both "provide a safe and comfortable ride for baby" and "optimal body positioning," are somewhat more definite statements, they are not comparative, *i.e.*, they do not claim *measurable* superiority to another product or claim to meet a *specific* standard the product does not, unlike Castrol's claims the Third Circuit found *were* actionable because Pennzoil claimed their motor oil was "superior," "backed by testing."  *Castrol*, 987 F.2d at 946.

Statements 5 through 7 discuss readily observable characteristics of the Aria that Jacobs does not allege are in dispute.  Statement 5 observes the Aria is smaller and lighter than the two Mesa car seats, Statement 6 notes the Aria comes with a cushion that preemies or newborns may use, and Statement 7 claims a back inlay automatically adjusts in tandem with a headrest.  Jacobs does not claim the Aria is larger than the Mesa car seats or that the back inlay does not adjust with the headrest.  Although Jacobs alleges the included cushions "fit" may not make the product safe for preemies or newborns, she does not allege UPPAbaby did not include the cushion with the Aria.

17

2.      *Jacobs does not plausibly allege UPPAbaby had pre-sale knowledge of the statements' falsity nor their actual falsity. Thus Statements 3 and 4 are not actionable.*

Statements 3 and 4 are sufficiently definite they are likely non-puffery, but the Court need not make that determination because they are not actionable for a different reason: Jacobs does not plausibly allege they are false. Nor, to the extent her fraud theories depend on knowing omission or concealment, does she plausibly allege that UPPAbaby knew before the sale that either statement was false. Both NJCFA claims premised on knowing omission and fraudulent concealment require UPPAbaby to have pre-sale knowledge of the statement's falsity. *Hardy v. Volkswagen Grp. of Am., Inc.*, 2025 WL 1409820, at *13 (D.N.J. May 14, 2025) (NJCFA); *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (fraudulent concealment), *overruled on other grounds*. And an express warranty claim requires the warranted product "ultimately [] not conform to the affirmation, promise, or description" made, *Volin v. Gen. Elec. Co.*, 189 F. Supp. 3d 411, 420 (D.N.J. 2016), *i.e.*, the statements are false as to the specific Aria Jacobs received.

Jacobs alleges UPPAbaby received complaints about the Aria *after* she bought it. [Docket No. 1 ¶ 79 ("***Since then***, multiple reviews have been posted to the Aria section of the Babylist website which warn other parents[.]") (emphasis added).] Despite "extensive research . . . including a review of UPPAbaby's website," Jacobs does not allege discovering any complaints about the Aria *before* she bought the car seat, *i.e.*, facts that the Court could rely on to plausibly infer UPPAbaby's pre-sale

knowledge.  [*Id.* ¶ 67.]  Jacobs's assertion of pre-sale knowledge rests on generalized complaints UPPAbaby received about the Mesa Max—which the Court will not consider.  *See* Section III.A, *supra*.

The same failure to allege complaints about the Aria *in general* fails to plausibly allege the car seat was not "suitable for preemies" or that "the two-piece [] insert [does not] ensure proper body positioning for infants[.]"  Jacobs musters a total of *two* complaints about the Aria.  [Docket No. 1 ¶¶ 79–81.]  One complaint refers to the same general "C-shaped" issue, and the other perfunctorily alleges the car seat is "a bad design."  [*Id.*]  Neither of those two complaints specify the child's weight, whether the child was premature, whether both components of the infant insert were installed and used as instructed, or whether the alleged posture occurred despite proper adjustment of the insert and harness.  In other words, the complaints do not allege whether the child experienced an ill-fit because they were a preemie who was too small for the car seat or an infant whom the two-piece insert failed to properly position in the car seat.  [*Id.*]  Without more specific allegations to plausibly allege Statements 3 and 4 are false, the Court cannot find UPPAbaby breached any alleged express warranty Statements 3 and 4 may have formed.  Conclusory assertions alone do not satisfy *Iqbal* and *Twombly*.  556 U.S. at 679; 550 U.S. at 555.

3.    *Jacobs does not plead a difference between the Aria's ordinary and particular purposes, thus her "particular purpose" claim fails.*

UPPAbaby claims the Aria is "safe and comfortable," [Docket No. 1 ¶ 130], which according to Jacobs, created an implied warranty for the particular purpose of

19

"safety and comfort." [*Id.*]  But if there is only one purpose for the product at issue, a plaintiff may not assert claims under both an implied warranty for a particular purpose *and* an implied warrantability of merchantability.  "Particular purpose" claims *require* a purpose separate and apart from a product's ordinary purpose.  *Beth Schiffer Fine Photographic Arts, Inc. v. Colex Imaging, Inc.*, 2014 WL 1908500, at *11 (D.N.J. May 13, 2014) (citing *Ferrari v. Am. Honda Motor Co., Inc.*, 2009 WL 211702, at *4 (N.J. Super. Ct. App. Div. Jan. 30, 2009)); *see also* N.J. Stat. Ann. § 12A:2-315 cmt. 2 ("A particular purpose' differs from the ordinary purpose for which the goods are used[.]").

Jacobs alleges the Aria's particular purpose is "safety and comfort," while alleging its ordinary purpose is "to safely transport infants, for regular personal and household use[.]" [Docket No. 1 ¶ 130.]  The Court fails to appreciate any difference between "safety and comfort" and "safe transportation for regular use."  Regular use presumably does not include transporting a baby *uncomfortably*.

Jacobs's implied warranty for a particular purpose claim mirrors one this Court previously dismissed.  *See generally Franulovic v. Coca Cola Co.*, 2007 WL 3166953, at *6 (D.N.J. Oct. 25, 2007) (Bumb, J.).  There, a plaintiff brought both flavors of implied warranty claim against Coca Cola for its Enviga beverages.  *Id.* at *1.  The Court could not find a difference between Enviga's alleged particular purpose and ordinary purpose—both of which were weight-loss or weight-control.  *Id.* at *5–6.  Because both purposes were the same there, the Court dismissed plaintiffs' "particular purpose" claims.  *Id.*  The Court similarly dismisses Jacobs's here.

20

**C.**     **None of the other bases Jacobs alleges demonstrate UPPAbaby fraudulently concealed material facts.**

Jacobs claims three remaining courses of conduct constitute fraud by concealment or omission:  failing to disclose "the defect," publishing videos depicting properly positioned infants in the Aria, and concealing "the real reason" for discontinuing the Mesa Max model.  [Docket No. 1 ¶ 108.]  None are persuasive. Fraudulent concealment claims require (1) a material misrepresentation, (2) defendant's knowledge of falsity, (3) intent of reliance, (4) actual reliance, and (5) damages.  *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997); *Tijerna v. Volkswagen Grp. of Am., Inc.*, 2023 WL 6890996, at *23 (D.N.J. Oct. 19, 2023). Fraudulent concealment claims premised on omissions, as Jacobs's claims are here, further require an affirmative duty to disclose the information.  *Ludwig*, 795 F. Supp. 3d at 554.

Jacobs's first assertion assumes there is a defect without alleging one.  Once again, Jacobs's failure to allege sufficient facts from which the Court can plausibly infer the Aria's design—rather than installation, misuse, infant anatomy, etc.—caused infants to slump into the "C-shape" makes it impossible to determine if UPPAbaby knew about the defect, misrepresented the defect, or had a duty to disclose the defect. Assuming *arguendo* Jacobs plausibly alleged such a defect, Jacobs does not identify consumer complaints about the ***Aria before she purchased it***.[13]  She alleges customers

---

[13] Jacobs bemoans UPPAbaby's reliance on publicly available National Highway Traffic Safety Administration ("NHTSA") data to demonstrate the complaints

posted negative reviews about the Aria *afterwards*.  [*Id.* ¶ 79.]  Thus, UPPAbaby had no knowledge of the purported defect.  Jacobs's best attempt is belied by the source she cites to.  Jacobs claims parents "said they would not recommend either the Aria or Mesa V2," but then cites to search results for Mesa Max car seat reviews.  [*Id.* ¶ 56.]  Complaints about the Mesa Max do not plausibly allege a defect in the Aria.

Jacobs alleges "marketing videos depicting properly positioned infants" illustrate UPPAbaby's fraudulent concealment of a defect.  Certainly, the Court cannot plausibly infer the Aria is unsafe for children from video evidence of a baby comfortably sitting in an Aria without slouching or assuming the subjective "C-shaped" position.  [Docket No. 1 ¶ 68 (citing videos of the Aria).]  Jacobs's argument then is UPPAbaby *staged* the baby's comfort.  That is a tall order Jacobs comes woefully short of fulfilling.  Jacobs does not allege facts that indicate UPPAbaby feigned a baby's comfort in its promotional videos.  Like many of her other allegations, the best she can do is conclusory statements about UPPAbaby's conspiratorial intent.  [*Id.* ¶ 72.]

---

UPPAbaby knew about were for Mesa Max car seats and not Arias.  But as this Court has previously held, matters of public record are fair game—even at the motion to dismiss stage. *Cannon v. Ashburn Corp.*, 2016 WL 7130913, at \*2 (D.N.J. Dec. 7, 2016) (Bumb, J.).  More problematic for Jacobs, she ignores her own reliance on NHTSA data and accompanying allegations that UPPAbaby monitored NHTSA complaints. [Docket No. 1 ¶ 57.]  Jacobs cannot allege UPPAbaby had notice through NHTSA complaints while protesting UPPAbaby's use of the same data to rebut her allegations.

The final example is easily dispensed with:  It is not about the Aria, and as discussed *supra*, Jacobs does not have standing to bring claims about car seats she did not purchase.  Jacobs's remaining fraudulent concealment claims are dismissed.  With no remaining bases for a fraudulent concealment or omission claim, Count II of the Complaint is dismissed without prejudice.

**D.    UPPAbaby's "Product Lifetime [Express] Warranty" only covers manufacturing defects and does not warrant against design defects.  Thus, UPPAbaby did not breach its express warranty to Jacobs.**

To prove a breach of an express warranty, Jacobs needs to show (1) UPPAbaby made an affirmation, promise, or description of the product; (2) that became a basis of the bargain for the product; and (3) the product ultimately did not conform to the affirmation, promise, or description.  *Puerto v. TimberTech Ltd.*, 126 F. Supp. 3d 447, 453 (D.N.J. 2015) (citing *Frederico*, 507 F.3d at 203).  Pre-sale notice and opportunity to cure are not required where, as here, a plaintiff bought the product at issue from a remote seller—*i.e.*, not the manufacturer.  *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *13 (D.N.J. May 8, 2017).  Warranties against defects in "manufacturing and workmanship" are distinct from warranties against design defects and do not warrant against design defects unless specifically provided.  *Hardy*, 2025 WL 1409820 at *15 (citing *Coba v. Ford Motor Co.*, 932 F.3d 114, 123 (3d Cir. 2019)).

The Product Lifetime Warranty guarantees against manufacturing—but not design—defects. It reads:[14]

> Your UPPAbaby product is warranted to be free from manufacturing defects for a period of 7 years from the date of manufacture under normal use and compliance with the operating instructions.

Warranties, UPPAbaby, https://uppababy.com/warranty (retrieved from the "Wayback Machine" as of August 6, 2025). Jacobs's claims that the Product Lifetime Warranty covers any alleged design defect in the Aria car seat cannot prevail.

Jacobs does not resist this result, [Docket No. 27 at 17 ("The Product Lifetime Warranty is not relevant here")], but instead claims whether a defect sounds in design or manufacture is a question that "must await discovery," [*id.* at 18]. Jacobs, however, only alleges a design defect plagued her Aria, [*see, e.g.*, Docket No. 1 ¶¶ 2, 123, 132], not a manufacturing defect. Her remaining express warranty claims need not await discovery for dismissal. Count III is dismissed without prejudice.

---

[14] When assessing a Rule 12 motion, Courts may consider documents "integral to **or explicitly relied upon**" by a Complaint without converting the motion to one for summary judgment. *Fallon v. Mercy Catholic Med. Ctr. of S.E. Pa.*, 877 F.3d 487, 493 (3d Cir. 2017). In her Complaint, Jacobs both acknowledged UPPAbaby's warranty covered "manufacturing defects," [Docket No. 1 ¶ 6], and cited the Product Lifetime Warranty on UPPAbaby's website, [*id.* n.2]. Thus, UPPAbaby's warranty is properly before the Court.

24

**E.**    **Nor did UPPAbaby breach the implied warranty of merchantability.  Unlike the Mesa Max at issue in *Mossazadeh*, the Complaint does not allege the Aria here is unsuitable for use as a car seat meeting minimum safety standards.**

Implied warranties of merchantability protect consumers by providing a remedy for products that are unfit for their ordinary use and purpose. *Crozier v. Johnson & Johnson Consumer Co.*, 901 F. Supp. 2d 494, 509 (D.N.J. 2012) (internal quotation marks omitted) (quoting *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992)).  Merchantability does not mean that products are "exactly as the buyer expected," but rather satisfy "a minimum level of quality."  *Nelson v. Nissan N. Am., Inc.*, 894 F. Supp. 2d 558, 566 (D.N.J. 2012).  Put another way, if a consumer buys a shovel, they should be able to dig a hole.

Once again, Jacobs's failure to plead factual material about the Aria is fatal. Jacobs bought the Aria and used it as a car seat until recently.  Jacobs cites *two* generalized Aria-specific complaints from consumers that allegedly demonstrate the Aria is incapable of safely transporting a child.  [Docket No. 1 ¶¶ 79–81.]  But those two complaints—as well as the rest of Jacobs's Complaint—offer nothing to explain how her grandson or any other child falls into a perceived slouched position in the Aria.  Putting aside the subjective nature of what it means to be "C-shaped," Jacobs provides no factual allegations permitting the Court to infer that the Aria's design as opposed to any other cause, such as installation, adjustment, or user error, plausibly caused infants to slouch or assume the "C-shaped" position.

25

Jacobs admits in the Complaint she has been using the car seat as a car seat for months. She bought the Aria in December 2024, [Docket No. 1 ¶ 17], and used it as a car seat until she filed her Complaint in August 2025, [*id.* ¶ 83 ("Plaintiff is ***now*** taking steps to find a safe, more appropriately designed car seat.")]. Notably absent is any allegation Jacobs replaced the Aria before suing UPPAbaby. The Court hastens to note that if the Aria was completely unusable, as Jacobs alleges, Jacobs's own admissions would lead one to question their plausibility—after all, she continued to use the Aria as a car seat after allegedly discovering a defect.

Jacobs ***strenuously*** cites to *Mossazadeh I* as an example for why their implied warranty claim succeeds. [Docket No. 27 at 12–13.] There, the court denied UPPAbaby's motion to dismiss plaintiffs' implied warranty claim, holding "the Complaint does not allege a subjective or atypical reaction, it alleges a product-level condition that, via ordinary use, places infants into a posture that can impede respiration and safe transport." 2025 WL 3211457, at *6. *Mossazadeh I* is distinguishable. Mossazadeh purchased the Mesa Max, *id.* at *1—the UPPAbaby product that ***has some history*** of consumer complaints, including multiple named plaintiffs claiming the same defect, *id.* at *1–2; [*see also* Docket No. 1 ¶¶ 57–58 (describing Mesa Max consumer complaints)].

Those increased consumer complaints nudged the Mossazadeh's complaint about the Mesa Max from merely conceivable to plausible. Because Jacobs does not plead a similar history for the Aria, and—unlike Mossazadeh—continued to use the

26

Aria for months, Jacobs's implied warranty of merchantability claim fails. Having ruled both of Jacobs's implied warranty theories fail as a matter of law, Count IV of the Complaint is dismissed without prejudice.

**F.    As UPPAbaby discovered, Jacobs's own authority dooms her unjust enrichment claim.**

Jacobs alleges UPPAbaby unjustly enriched itself by keeping the full sales price of Aria car seats while Jacobs did not receive the full benefit of her bargain by overpaying for an allegedly defective product. [Docket No. 1 ¶¶ 151–53.] Although Jacobs may plead unjust enrichment in the alternative, *Maniscalco v. Brother Int'l Corp.*, 627 F. Supp. 2d 494, 505 (D.N.J. 2009), as she does here, [Docket No. 1 ¶ 149], it must nevertheless fail. New Jersey law requires a ***direct*** relationship between a purchaser and manufacturer to sustain an unjust enrichment claim. *Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 724 (D.N.J. 2011) (cited at Docket No. 27 at 27) (citing *Cooper v. Samsung Elec. Am., Inc.*, 2008 WL 4513924, at *10 (D.N.J. Sept. 30, 2008) ("[T]here was no relationship conferring any direct benefit on Samsung through Cooper's purchase, as the purchase was through a retailer, Ultimate Electronics.")); *see also Maniscalco*, 627 F. Supp. 2d at 506; *Tarsky v. TD Bank, N.A.*, 2026 WL 1786300, at *4–5 (D.N.J. June 22, 2026).

Jacobs bought her Aria from Amazon, [Docket No. 1 ¶ 17], and her unjust enrichment claim fails as a matter of law. An exception to the general rule may apply when the reseller is not an "innocent third-party." *Roche Diagnostics Corp. v. Smith*, 2022 WL 4596720, at *17 (D.N.J. Sept. 30, 2022). But Jacobs does not allege Amazon

27

(or Babylist which recommended the Aria for that matter) participated in any common plan or scheme with UPPAbaby to cause her harm. The exception does not apply or salvage her claim.

Jacobs's citation to a contrary proposition in *In re K-Dur Antitrust Litigation* is not persuasive. The Court in *K-Dur* simultaneously entertained unjust enrichment claims from "all fifty states, the District of Columbia, and Puerto Rico." 338 F. Supp. 2d 517, 543 (D.N.J. 2004). Applying ***general unjust enrichment principles***, *K-Dur* allowed an indirect purchaser class to proceed past the motion to dismiss stage. *Id.* at 545. Here, New Jersey law trumps those general principles. Noting the distinction between *K-Dur* and New Jersey unjust enrichment principles, courts dismiss claims premised on the same argument Jacobs makes here. *See, e.g.*, *Cooper*, 2008 WL 4513924 at *10 ("*K-Dur* did not apply New Jersey law: it applied only the 'generally applicable theories of unjust enrichment.' As Cooper's unjust enrichment claim cannot meet the additional directness requirements imposed by New Jersey law his unjust enrichment claim must be dismissed.") (citation modified). Count VI is dismissed without prejudice.

**G.    Jacobs's MMWA claim does not satisfy its class action numerosity requirement and must be dismissed.**

Jacobs is the ***only*** named plaintiff in this action. [*See generally* Docket No. 1.] MMWA claims may not proceed as class actions with less than 100 named plaintiffs. *Rowland v. Bissell Homecare, Inc.*, 73 F.4th 177, 180, 182 (3d Cir. 2023); *Diaz v. FCA US LLC*, 693 F. Supp. 3d 425, 445 (D. Del. 2023); *Rains v. Jaguar Land Rover N. Am., LLC*,

28

2023 WL 6234411, at *3 (D.N.J. Sept. 26, 2023) ("Plainly, there are less than 100 named plaintiffs in this class action, and therefore, the Court lacks jurisdiction."). Conceding as much, Jacobs suggests the Court use its supplemental jurisdiction to hear her MMWA claims. [Docket No. 27 at 17 n.13.] The Third Circuit opened the door to MMWA claims reaching district courts through Congress's grant of supplemental jurisdiction,[15] *Suber v. Chrysler Corp.*, 104 F.3d 578, 588 n.12 (3d Cir. 1997) ("If the district court finds that Suber has [original] jurisdiction with his [other claims], the court can exercise supplemental jurisdiction over the Magnuson–Moss Act claim."), but the Court declines to do so here.

With none of her other claims surviving, if the Court were to exercise its supplemental jurisdiction, then Jacobs's MMWA claim would stand alone—an outcome the Third Circuit forbids. *Rowland*, 73 F.4th at 183 n.10 ("[A] district court cannot exercise supplemental jurisdiction over an MMWA claim where no other claims are asserted."). Even if a standalone MMWA claim *were* permissible under § 1367, federal courts decline their supplemental jurisdiction when no claims within their original jurisdiction remain. *Reiner v. Northumberland Cnty.*, 734 F. Supp. 3d 379, 390, 390 n.89 (M.D. Pa. 2024) (collecting cases and noting, "In the Third Circuit, supplemental jurisdiction should not be exercised when there is no longer any basis

---

[15] 28 U.S.C. § 1367.

29

for original jurisdiction.") (citation modified).  Count V of the Complaint is dismissed without prejudice.

## V.    CONCLUSION

For the foregoing reasons, UPPAbaby's Motion to Dismiss is **GRANTED**. Jacobs's Complaint is **DISMISSED WITHOUT PREJUDICE.**  Jacobs may file an amended complaint within the next forty-five (45) days without further leave of this Court—if she may do so consistently with Federal Rule of Civil Procedure 11(b).  An accompanying Order shall issue.

July 27, 2026                                          **/s/Renée Marie Bumb**
Date                                                        RENÉE MARIE BUMB
                                                               Chief United States District Judge